# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-1961, 03-2595

WEI CONG MEI,

Petitioner,

v.

JOHN ASHCROFT, Attorney General
of the United States,

Respondent.

On Petitions for Review of Orders of
the Board of Immigration Appeals.
No. A 45 206 486

ARGUED OCTOBER 5, 2004—DECIDED DECEMBER 29, 2004

Before POSNER, KANNE, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. Wei Cong Mei has petitioned us for review of two orders by the Board of Immigration Appeals, one ordering him removed from this country and the other, which need not be discussed separately, denying his motion to reconsider the first order. The principal issue we consider is the meaning of "crimes involving moral turpitude" in immigration law and generally.

In 1998 Mei (who had been admitted to the United States as a lawful permanent resident three years previously) was

convicted of unlawful possession of a stolen motor vehicle, in violation of 625 ILCS 5/4-103(a)(1), and sentenced to 30 months' probation. Three years later he was convicted of aggravated fleeing from a police officer in violation of 625 ILCS 5/11-204.1(a)(1), the "aggravation" consisting in his fleeing at 21 or more miles per hour above the speed limit. He sped away from the officer—who had turned on his siren and flashing lights—at 105 miles per hour in a 55 m.p.h. zone. For this crime Mei was sentenced to a year in prison.

Under the heading of "general crimes," the immigration law makes removable an alien who "(I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status . . .) after the date of admission, and (II) is convicted of a crime for which a sentence of one year or longer may be imposed." 8 U.S.C. § 1227(a)(2)(A)(i). Mei clearly qualifies, since he committed a crime that he concedes to involve moral turpitude—unlawful possession of a stolen vehicle—three years after his admission to this country and it is a crime punishable by a sentence of one year or more. The crime is a "Class 2 felony," 625 ILCS 5/4-103(b), for which the maximum sentence is 7 years. 730 ILCS 5/5-8-1(a)(5).

But, remarkably, given that the immigration judge had ruled that Mei was removable both because aggravated fleeing is a crime involving moral turpitude and because unlawful possession of a motor vehicle also is such a crime—as Mei concedes—the Board, without any reference to the conviction for unlawful possession, pitched its order of removal on the sole ground that aggravated fleeing (which is also punishable by a sentence of a year or more, see 625 ILCS 5/11-204.1(b); 730 ILCS 5/5-8-1(a)(7)) is a crime involving moral turpitude, which Mei denies. Actually it's unclear whether that was the Board's sole ground; the

Board may have thought that one of its earlier orders in what has become a protracted proceeding had affirmed the immigration judge's alternative ground for removal. But if so, why did it bother to devote an opinion to the aggra-vated-fleeing ground? At any rate the government is insist-ent that it was the Board's sole ground, and so has waived any reliance it might have placed on Mei's concession that unlawful possession of a motor vehicle is a crime of moral turpitude punishable by a sentence of a year or more in prison. So we can't avoid deciding whether aggravated fleeing is a crime involving moral turpitude.

But maybe it is not *we* who have to decide, but the Board. The courts that have addressed the question (our court has not) agree that the Board's interpretation of the meaning of "crime involving moral turpitude" is entitled to *Chevron* de-ference; see *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999), where the Supreme Court gave *Chevron* deference to the Board's interpretation of another term in the immigration statute, "serious nonpolitical crime." But they are divided over whether the Board's decision to classify a particular crime as one involving moral turpitude is entitled to such deference. Compare *Knapik v. Ashcroft*, 384 F.3d 84, 87 (3d Cir. 2004); *Chanmouny v. Ashcroft*, 376 F.3d 810, 811 (8th Cir. 2004), and *Cabral v. INS*, 15 F.3d 193, 195 (1st Cir. 1994), holding that it is, with *Smalley v. Ashcroft*, 354 F.3d 332, 336 (5th Cir. 2003), and *Rodriguez-Herrera v. INS*, 52 F.3d 238 n. 4 (9th Cir. 1995), holding the contrary.

Since Congress did not define "crime involving moral turpitude" when it inserted the term in the immigration statute, and the term had no settled meaning at the time (and has none still), it is reasonable to suppose à la *Chevron* that Congress contemplated that the agency charged with administering the statute would define the term, and speci-fically would tailor the definition to the policies embodied

in the immigration statutes. The Board of Immigration Appeals has done neither. When the Board says that "moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong, or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude," *In re Ajami*, 22 I. & N. Dec. 949, 950 (BIA 1999) (this was also its formula in the present case), or that "moral turpitude refers generally to conduct which is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between [persons or to] society in general," *In re Danesh*, 19 I. & N. Dec. 669 (BIA 1988), it is merely parroting the standard criminal-law definition. E.g., *Speed v. Scott*, 787 So. 2d 626, 633 (Miss. 2001); *Benitez v. Dunevant*, 7 P. 3d 99, 104 (Ariz. 2000); *In re Sims*, 861 A.2d 1, 3 n. 2 (D.C. App. 2004); *State v. Miller*, 836 P.2d 1004, 1005 (Ariz. App. 1992); *People v. Brooks*, 4 Cal. Rptr. 2d 570 (App. 1992); *Bane v. State*, 533 A.2d 309, 314 (Md. Spec. App. 1987). It is not deploying any insights that it might have obtained from adjudicating immigration cases.

Since the Board hasn't done anything to particularize the meaning of "crime involving moral turpitude," giving *Chevron* deference to its determination of that meaning has no practical significance. It is only the second issue, the one that divides the courts, that has any significance—the issue of deciding which crimes involve moral turpitude. The resolution of that issue depends on whether the character, the gravity, the moral significance of particular crimes is a topic that Congress, had it thought about the matter, would have wanted the Board to decide rather than the courts. Perhaps so; and if so, the courts that accord *Chevron* deference to the Board's classification of particular crimes as involving moral turpitude are on the right track. We need not decide. We

shall see that the Board's determination in this case must be upheld whether great or for that matter no deference is given to its judgment.

A curious feature of this case is that both sides have limited their research into the meaning of "moral turpitude" to immigration cases, even though as we have seen the term bears the same meaning in immigration law as in the criminal law and even though there are no immigration cases on point. In fairness, though, most of the recent cases involving the question whether a crime involves moral turpitude *are* immigration cases; and in federal law at least, the term "moral turpitude" has little significance outside the immigration setting. Although the term is of seventeenth-century origin and has been a ground for excluding aliens since 1891, Brian C. Harms, "Redefining Crimes of Moral Turpitude: A Proposal to Congress," 15 *Geo. Immigr. L.J.* 259, 262 (2001), it is largely a stranger to the federal criminal code.

In desperation the government cites an immigration case in which concealing drug money was held to involve moral turpitude, *Smalley v. Ashcroft, supra*, 354 F.3d at 339, and asks us to analogize it to the present case on the ground that Mei wouldn't have fled from the police if he hadn't had something disreputable to conceal. The argument gives new meaning to arguing by analogy. Not only did Mei have nothing to conceal (for, as far as the record reveals, when he was apprehended after the chase no contraband or evidence of crime was found in his car), but that's often the case when drivers "take off" when they hear the siren and see the flashing lights of a police car trying to overtake them. Had the parties broadened their research to take in cases in which moral turpitude is found (or not found) in criminal as distinct from immigration cases, they would have found a couple of cases more nearly in point than any that either of them cites. *Barge v. State*, 568 S.E.2d 841, 845 (Ga. App.

2002); *People v. Dewey*, 49 Cal. Rptr. 2d 537, 541 (App. 1996). But unfortunately the cases point in opposite directions. We are writing on a clean slate.

The natural way to approach the question whether "crimes involving moral turpitude" include aggravated fleeing would be to enumerate the crimes that have been held to involve moral turpitude and those that have been held not to, and see which of the groups aggravated fleeing is closer to; for we have found no reported cases classifying that particular offense as involving or not involving moral turpitude. In general, crimes in the first class are (1) serious crimes, in terms either of the magnitude of the loss that they cause or the indignation that they arouse in the law-abiding public (hence during the Prohibition era Judge Learned Hand refused to declare every violation of a prohibition law a crime involving moral turpitude, *United States ex rel. Iorio v. Day*, 34 F.2d 920, 921 (2d Cir. 1929)), that are (2) deliberate, because a person who *deliberately* commits a *serious* crime is regarded as behaving immorally and not merely illegally. *Nguyen v. Reno*, 211 F.3d 692, 695 (1st Cir. 2000); *Gonzalez-Alvarado v. INS*, 39 F.3d 245, 246 (9th Cir. 1994) (per curiam); *Grageda v. INS*, 12 F.3d 919, 922 (9th Cir. 1993). Conspiring to evade federal taxes on "4,675 gallons of alcohol and an undetermined quantity of distilled spirits" was held in *Jordan v. De George*, 341 U.S. 223, 225 n. 5 (1951), to be a crime involving moral turpitude; large-scale tax fraud is a serious crime and a deliberate one. Crimes in the second class—crimes deemed not to involve moral turpitude—are either very minor crimes that are deliberate or graver crimes committed without a bad intent, most clearly strict-liability crimes. *Rodriguez-Herrera v. INS*; *supra*, 52 F.3d at 241; *Goldeshtein v. INS*, 8 F.3d 645, 647 (9th Cir. 1993); *State v. Miller*, *supra*, 836 P.2d at 1005.

Some cases, such as *Hamdan v. INS*, 98 F.3d 183, 188 (5th Cir. 1996), seem to require, for classification as a crime involving moral turpitude, an "evil intent" that goes beyond merely the intent to commit the crime. That is unhelpful. If the crime is a serious one, the deliberate decision to commit it can certainly be regarded as the manifestation of an evil intent. Conversely, if the crime is trivial, even a deliberate intent to commit it will not demonstrate an intent so "evil" as to make the crime one of moral turpitude. *Rodriguez-Herrera v. INS*, *supra*, 52 F.3d at 240-41.

The distinction between the two classes of case that we have described corresponds, as noted in *Beltran-Tirado v. INS*, 213 F.3d 1179, 1184 (9th Cir. 2000), and *Orlando v. Robinson*, 262 F.2d 850, 851 (7th Cir. 1959), to the distinction between crimes that are malum in se and crimes that are malum prohibitum. The former refer to crimes that because they violate the society's basic moral norms are known by everyone to be wrongful, the latter to crimes that are not intuitively known to be wrongful. *United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002); *United States v. Beavers*, 206 F.3d 706, 710 (6th Cir. 2000) ("the lack of intuitive wrongfulness is the hallmark of all laws that are *malum prohibitum*"). In application, however, the distinction turns out to be paper thin. In South Carolina, for example, simple possession of cocaine is classified as a crime involving moral turpitude, *State v. Major*, 391 S.E. 2d 235, 237 (S.C. 1990), but simple possession of marijuana is not. *State v. Harvey*, 268 S.E.2d 587, 588 (S.C. 1980). An alien convicted of making false statements on an employment application and using a fake Social Security number was held in *Beltran-Tirado v. INS*, *supra*, not to have committed a crime involving moral turpitude, but the crime of making false statements in a driver's license application was held in *Zaitona v. INS*, 9 F.3d 432 (6th Cir. 1993), to involve moral turpitude.

The holdings of the Board of Immigration Appeals are consistent with regard to some crimes but "there are a number of miscellaneous cases involving indecent acts, gambling, perjury, and other crimes where the findings of moral turpitude vary widely." *Toutounjian v. INS*, 959 F. Supp. 598, 603 (W.D.N.Y. 1997). The Board should not be blamed too harshly; courts have equally failed to impart a clear meaning to "moral turpitude." Time has only confirmed Justice Jackson's powerful dissent in the *De George* case, in which he called "moral turpitude" an "undefined and undefinable standard." 341 U.S. at 235. The term may well have outlived its usefulness. But that is not for us to decide, and let us turn at last to Mei's offense.

Mei contends that aggravated fleeing in Illinois is a crime of strict liability because the statute does not require that the defendant have fled the police knowingly. And it is of course possible to be speeding and not know that a police officer is in pursuit. This is possible though unlikely even if the police officer has turned on his siren and flashing lights, because some drivers are extremely inattentive, which is a fault but not a deep moral wrong. (The driver might be impaired by age or illness yet not know it.) But the statute that Mei violated defines a subset of fleeing, namely fleeing at 21 or more miles per hour above the speed limit. The statute that defines the unaggravated version of the offense, 625 ILCS 5/11-204(a), explicitly requires a willful failure or refusal to obey a police officer's order to stop. It would be unlikely for the aggravated version of the offense to have dropped the requirement of willfulness, though not impossible, because the legislature might think that the requirement for the aggravated offense that the defendant has exceeded the speed limit by at least 21 m.p.h. was a proxy for willfulness as well as evidence of increased dangerousness warranting a heavier penalty. But however this may be, the

requirement of proving willfulness is implicit in the aggravated offense. Ill. Pattern Jury Instructions-Crim. 23.03 (2003).

It seems to us that a person who deliberately flees at a high speed from an officer who, the fleer knows, wants him to stop, thus deliberately flouting lawful authority and endangering the officer, other drivers, passengers, and pedestrians, is deliberately engaged in seriously wrongful behavior, as held in *People v. Dewey*, *supra*, albeit under a somewhat differently worded statute. See also *Knapik v. Ashcroft*, *supra*. He may not want to endanger anyone, but he has to know that he is greatly increasing the risk of an accident (and for the further reason that a fleeing driver is dividing his attention between the road ahead and his pursuer); and he is doing so as a consequence of his deliberate and improper decision to ignore a lawful order of the police. We conclude, therefore, that aggravated fleeing is indeed a crime involving moral turpitude.

Mei argues that, even if so, he should have been granted asylum because he is an opponent of China's "one-child" policy and consequently faces persecution if he is sent back to China. The immigration judge, however, seconded by the Board, resolved critical credibility issues against Mei's claim.

The petition to review the order of removal, and the denial of the petition for reconsideration, are

DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*