POSNER, Circuit Judge,
concurring in the judgment.
I agree that we should grant the petition and therefore remand the case to the Board of Immigration Appeals for reconsideration of the Board’s refusal to cancel the order that the petitioner b.e removed (deported) from the United States.
I do not however agree with the respect that Judge Hamilton’s opinion accords the concept of “moral turpitude.” It is preposterous that that stale, antiquated, and, worse, meaningless phrase should continue to be a part of American law. Its meaninglessness is well illustrated by this case; and even if it is to be retained in immigration law it was misapplied by the Board of Immigration Appeals.
*831 The concept plays a particularly malign role in immigration adjudication, as this case illustrates, because conviction of a crime involving moral turpitude bars the Attorney General from canceling the removal, or adjusting the status, of an alien. See 8 U.S.C. §§ 1229b(b)(l)(C), 1182(a)(2)(A)(i)(I).
The term “crime involving moral turpitude” first appeared in Brooker v. Coffin, 5 Johns. 188 (N.Y. 1809); see Note, “Crimes Involving Moral Turpitude,” 43 Ham L. Rev. 117, 118 n. 7 (1929). Without defining the term, the court concluded that prostitution and other disorderly-conduct offenses were not crimes of moral turpitude, and therefore falsely accusing someone of such an offense could not support a suit for slander. Brooker v. Coffin, supra, 5 Johns, at 191-92. But the term appeared rarely in case law until legislators began to invoke it, notably in the closing years of the nineteenth century, when in the Act of March 3, 1891, ch. 551, 51st Cong., 2d Sess., Congress, worried by the swelling tide of immigration to the United States, forbade the admission, among other categories of disfavored aliens (such as polygamists), of aliens “who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude.”-Why Congress chose the term “moral turpitude” to describe crimes that should bar aliens is unclear because there was no attempt to explain it either in the statute itself or in the legislative history. See Staff of House Committee on the Judiciary, 100th Cong., Grounds for Exclusion of Aliens Under the Immigration and Nationality Act: Historical Background and Analysis 10 (Comm. Print. 1988).
Congress has never defined “moral turpitude,” but courts and the immigration agencies have tended to adopt a slight variant of the definition in Black’s Law Dictionary: an “act of baseness, vileness, or the depravity in private and social duties which man owes to his fellow man, or to society in general.... [An] act or behavior that gravely violates moral sentiment or accepted moral standards of [the] community and is a morally culpable quality held to be present in some criminal offenses as distinguished from others.” Black’s Law Dictionary 1008-09 (6th ed. 1990). Thus Lagunas-Salgado v. Holder, 584 F.3d 707, 710 (7th Cir. 2009), remarked that “the BIA has described a crime of moral turpitude as including ‘conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.’ ” The most recent edition of Black’s offers a simpler but broader definition: “conduct that is contrary to justice, honesty, or morality; esp., an act that demonstrates depravity.” Black’s Law Dictionary 1163 (10th ed. 2014).
It’s difficult to make sense of these definitions, which approach gibberish yet are quoted deferentially in countless modern opinions. See, e.g., Blake v. Carbone, 489 F.3d 88, 103 (2d Cir. 2007); De Leon-Reynoso v. Ashcroft, 293 F.3d 633, 636 (3d Cir. 2002); Hamdan v. INS, 98 F.3d 183, 186 (5th Cir. 1996); In re Solon, 24 I. & N. Dec. 239, 240 (BIA 2007); In re Ajami, 22 I. & N. Dec. 949, 950 (BIA 1999). What does “the public conscience” mean? What does “inherently base, vile, or depraved”— words that have virtually dropped from the vocabulary of modern Americans — mean and how do any of these terms differ from “contrary to the accepted rules of morality”? How for that matter do the “accepted rules of morality” differ from “the duties owed between persons or to society in general”? And — urgently—what is “depravity”? A partial list of its synonyms, according to a Google search, includes corruption, vice, perversion, deviance, degeneracy, immorality, debauchery, dissipation, *832 profligacy, licentiousness, lechery, prurience, obscenity, indecency, a wicked or morally corrupt act, the innate corruption of human nature due to original sin, moral perversion, bestiality, flagitiousness, and putrefaction.
The definitions constitute a list of antiquated synonyms for bad character, and why does the legal profession cling to antiquated synonyms? Why are we so backward-looking? The answer lies in the American legal culture — in the fact that law is backward-looking, that the legal profession revels in antiquity, cherishes jargon, and lacks respect for proper English usage — “base or vile” is not an expression used by sophisticated speakers of modern English, or for that matter unsophisticated, and the word “turpitude” has disappeared from the language as spoken and written today. The language I quoted from Black’s — who talks like that? Who needs to talk like that? Lawyers apparently, and they go a step further into the lexical mud by intoning an adjectival form of “turpitude”: “turpitudinous.”
We suggested in Mei v. Ashcroft, 393 F.3d 737, 741 (7th Cir. 2004) — a case that hinted at misgivings about the utility of moral turpitude as a criminal category— that the distinction between crimes that are and crimes that are not crimes of moral turpitude
corresponds, as noted in Beltran-Tirado v. INS, 213 F.3d 1179, 1184 (9th Cir. 2000), and Orlando v. Robinson, 262 F.2d 850, 851 (7th Cir. 1959), to the distinction between crimes that are ma-lum in se and crimes that are malum prohibitum. The former refer to crimes that because they violate the society’s basic moral norms are known by everyone to be wrongful, the latter to crimes that are not intuitively known to be wrongful. United States v. Urfer, 287 F.3d 663, 666 (7th Cir. 2002); United States v. Beavers, 206 F.3d 706, 710 (6th Cir. 2000) (“the lack of intuitive wrongfulness is the hallmark of all laws that are malum prohibitum”). In application, however, the distinction turns out to be paper thin. In South Carolina, for example, simple possession of cocaine is classified as a crime involving moral turpitude, State v. Major, 301 S.C. 181, 391 S.E.2d 235, 237 (1990), but simple possession of marijuana is not. State v. Harvey, 275 S.C. 225, 268 S.E.2d 587, 588 (1980). An alien convicted of making false statements on an employment application and using a fake Social Security number was held in Beltran-Tirado v. INS, supra, not to have committed a crime involving moral turpitude, but the crime of making false statements in a driver’s license application was held in Zaitona v. INS, 9 F.3d 432 (6th Cir. 1993), to involve moral turpitude. The holdings of the Board of Immigration Appeals are consistent with regard to some crimes but “there are a number of miscellaneous eases involving indecent acts, gambling, perjury, and other crimes where the findings of moral turpitude vary widely.” Toutounjian v. INS, 959 F.Supp. 598, 603 (W.D.N.Y. 1997).
The background that I have sketched may help prepare the reader for the mysterious ways in which the federal government classifies crimes against itself (for that is the nature of the crime that the petitioner in this case, Maria Arias, committed — a crime against the government) as “turpitudinous” or not.
The U.S. Department of State Foreign Affairs Manual (FAM), in Volume 9 Visas, 9 FAM 40.21(a) N2.3-2 Crimes Committed Against Governmental Authority (2015), divides crimes against government into those that are, and those that are not, crimes of moral turpitude:
*833 a. Crimes committed against governmental authority which fall within the definition of moral turpitude include:
(1) Bribery;
(2) Counterfeiting;
(3) Fraud against revenue or other government functions;
(4) Mail fraud;
(5) Perjury;
(6) Harboring a fugitive from justice (with guilty knowledge); and
(7) Tax evasion (willful).
b. Crimes committed against governmental authority, which would not constitute moral turpitude for visa-issuance purposes, are, in general, violation of laws which are regulatory in character and which do not involve the element of fraud or other evil intent. The following list assumes that the statutes involved do not require the showing of an intent to defraud, or evil intent:
(1) Black market violations;
(2) Breach of the peace;
(3) Carrying a concealed weapon;
(4) Desertion from the Armed Forces;
(5) Disorderly conduct;
(6) Drunk or reckless driving;
(7) Drunkenness;
(8) Escape from prison;
(9) Failure to report for military induction;
(10) False statements (not amounting to perjury or involving fraud);
(11) Firearms violations;
(12) Gambling violations;
(13) Immigration violations;
(14) Liquor violations;
(15) Loan sharking;
(16) Lottery violations;
(17) Possessing burglar tools (without intent to commit burglary);
(18) Smuggling and customs violations (where intent to commit fraud is absent);
(19) Tax evasion (without intent to defraud); and
(20)Vagrancy.
The division between the two lists is arbitrary. The first is open-ended and therefore provides incomplete guidance on how to avoid committing a crime of moral turpitude against the government. The second list, the list of crimes that do not involve moral turpitude, includes a number of crimes that are as serious, as “turpitudi-nous” — one steeped in the jargon of crimes of moral turpitude might say — as those in the first list: desertion from the Armed Forces, prison escape, smuggling, and failure to report for military induction (i.e., draft dodging, when there is a draft). Some of the- crimes in the second list make no sense, such as possessing burglar tools without intent to commit burglary and committing tax evasion without intent to defraud. Others are defined so broadly as to include criminal behavior serious enough to belong on the first list, examples being breach of the peace, firearms violations, and loan sharking. The pair of lists seems the product of a disordered mind. They make no sense.
The petitioner’s crime was the use of a social security number that had been assigned to another person by the Social Security Administration. That was a felony. 42 U.S.C. § 408(a)(7)(B). She had used the number to obtain a job. There is no indication that had she not done this, an American citizen would have gotten the job in her stead rather than one of the 10 or 11 million other illegal aliens who live in the United States and like Arias need to work in order to support themselves. The statute does not require proof of intent to cause harm — an absence that one would think would negate an inference of moral turpitude. Nor is it required that the violation be material; nor was there proof in this case that the violation wrongfully deprived anyone of social security benefits or increased the expenses of government. Unsurprisingly Arias was punished very light *834 ly: she was merely placed on probation for a year and assessed $100, which is the mandatory assessment for felony convictions. See 18 U.S.C. § 3013. So: no incarceration, no fine, just a year’s probation and an assessment equivalent to the amount of money she earns in 9.1 hours of work (for her wage is $10.97 per hour).
Conceivably her very light sentence reflects in part the fact that she has two young children, has worked without incident since coming to the United States in 2000, and has paid federal income tax. Or maybe the judge thought her crime trivial, as do I. (Has the Justice Department nothing better to do with its limited resources than prosecute a mouse? Has prosecutorial discretion flown out the window?) She did not steal or invent the social security number; it was given her by the persons who smuggled her into the United States.
After completing her probation she was allowed to resume her employment with the same company she’d worked for until her arrest, and she obtained a glowing letter of support from the general manager. She does manual work for the company, described by the general manager as “sealer sanding doors, wear thru and working with specialty paints.” It is the kind of work that illegal immigrants typically do, because it is not pleasant work and it is not well paid.
To prosecute and deport such a harmless person (to Ecuador, her country of origin) — indeed a productive resident of the United States — would be a waste of taxpayers’ money, but to deport her on the ground that her crime was one of moral turpitude would be downright ridiculous. The crime she committed does not appear in the State Department’s list of crimes of moral turpitude, and it is less serious than many of the crimes in the second list (those that are not crimes of moral turpitude). It is somewhat similar to crime category 13 in the second list — “immigration violations” — but she was not convicted of violating immigration law, but instead of violating a section of 42 U.S. Code, Chapter 7, Subchapter II. The title of the sub-chapter is “Federal Old-Age, Survivors, and Disability Insurance Benefits.” Her crime could also be placed in category 10 on the second list — “false statements (not amounting to perjury or involving fraud).” The State Department explicitly tells us that false statements do not constitute crimes of moral turpitude.
And yet the government argues that the petitioner’s conduct was “deceptive” and therefore a crime of “moral turpitude.” But glance again at the second list, the list of crimes that are not crimes of moral turpitude. In addition to crime 10 — “false statements” — which by definition involves deception, crimes 1, 3, 4, 15, 18, and 19 on that list may also involve deception. When a panel of this court said in Marin-Rodriguez v. Holder, 710 F.3d 734, 738 (7th Cir. 2013), a case factually almost identical to this one, that “crimes entailing an intent to deceive or defraud are unquestionably morally turpitudinous,” it was deviating from the Manual without explanation.
Interestingly, the immigration judge in our case said that “unfortunately” the Seventh Circuit had ruled in Marin-Rodriguez that the type of conviction involved in Arias’s ease was “inherently turpitudi-nous.” The judge’s instincts were sound, but she felt bound by our decision. The Board of Immigration Appeals affirmed her ruling primarily on the authority of Marin-Rodriguez. But Marin-Rodriguez was wrong and should be overruled. The court had no basis for rejecting what for a change was proper guidance from the State Department’s Manual.
The idea that fraudulent intent colors any crime “turpitudinous” had received its authoritative modern statement in Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951), like this a deportation *835 case, where we read for example that “fraud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude.” Id. at 229, 71 S.Ct. 703. But notice that the word used by the Court to describe a crime of moral turpitude was “fraud,” not “deception,” and De George was a fraud case in the core sense of “fraud”: it was a conspiracy to defraud the federal government of tax revenues.
Yet, though it was a much stronger case for deportation than this case, the majority opinion evoked a remarkable dissent by Justice Jackson, id. at 232-245, 71 S.Ct. 703, joined by Justices Black and Frankfurter. The dissent picked apart the concept of “moral turpitude.” It exposed its emptiness (“Congress did not see fit to state what meaning it attributes to the phrase ‘crime involving moral turpitude.’ It is not one which has settled significance from being words of art in the profession. If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral. The Government confesses that it is ‘a term that is not clearly defined,’ and says: ‘the various definitions of moral turpitude provide no exact test by which we can classify the specific offenses here involved.’ Except for the Court’s opinion, there appears to be universal recognition that we have here an undefined and undefinable standard”). Id. at 234-235, 71 S.Ct. 703. And the dissent argued convincingly that deportation was an extreme sanction to impose on De George, the alien, without a more definite standard guiding its imposition. See id. at 240-242, 71 S.Ct. 703.
Alas, a great dissent by a great Justice has been forgotten. The concept of moral turpitude, in all its vagueness, rife with contradiction, a fossil, an embarrassment to a modern legal system, continues to do its dirty work. Even so, and despite the precedent of Marin-Rodriguez, there is a route to justice in this case. It is to recognize that this is not a fraud case. Although convicted of a crime against the government, the petitioner, unlike her predecessor De George, was not seeking any money from the government. So far as appears her crime harmed no one, least of all the government though it is the “victim” of her crime, and so even the muddled over-broad Foreign Affairs Manual provides no basis for classifying her crime as one of moral turpitude. This case is identical to Beltran-Tirado v. INS, supra, where the Ninth Circuit held that using a false social security number on an employment verification form in order to obtain employment was not a crime of moral turpitude. Consider, too, In re Delagadillo, 15 I. & N. Dec. 395 (BIA 1975), where the Board of Immigration Appeals held that an applicant for admission to the United States who had “fabricated a property transfer in an unsuccessful attempt to reduce his wife’s potential settlement in a divorce action” had not committed a crime “so base or vile as to be deemed morally turpitudi-nous.” The Ninth Circuit and the Board of Immigration Appeals recognized in these cases, as the State Department does in its manual, that deception alone is not enough to make a crime one of moral turpitude. Our prior cases that have purported to extend De George’s fraud rule to cover any deception have generally done so in dicta, because the cases involved more than simple deception. See Abdelqadar v. Gonzales, 413 F.3d 668, 671 (7th Cir. 2005); Padilla v. Gonzales, 397 F.3d 1016, 1017-18, 1020-21 (7th Cir. 2005).
In Lagunas-Salgado v. Holder, 584 F.3d 707 (7th Cir. 2009), an alien had been convicted of making “false Social Security *836 and alien registration cards so that others could find employment.” Id. at 708. The Board of Immigration Appeals deemed his crime one of moral turpitude and a panel of this court affirmed. It was a more serious crime than our petitioner’s, because Lagunas-Salgado had sold false papers to about 50 people, some for as much as $100; and he was sentenced to five months in prison and two years of probation, a much heavier sentence than Arias received. The panel opinion in Lagunas-Salgado remarks with apparent approval the BIA’s conclusion “that petty larceny and issuing a worthless check involve moral turpitude” but that “crimes such as importing, selling, or possessing drugs do not involve moral turpitude because evil intent is not an element of the offense.” Id. at 710. That is an absurd distinction, given that the congressional mandate is to identify crimes that are morally reprehensible and thus a proper ground for deportation.
Yet the approach I’m suggesting derives support from Lagunas-Salgado. The panel was emphatic that it was a fraud case, 584 F.3d at 711-12, and I read Jordan v. De George to hold that crimes of fraud are ipso facto crimes of moral turpitude. Lagu-nas-Salgado gave away some of his false documents but sold others, and was “deceiving the government” because “he knew the persons receiving the false documents would use them in an attempt to obtain work that they could not otherwise lawfully obtain.” Id. at 712. The petitioner in our case did not forge documents, let alone for gift or sale to other persons. The impact of her conduct on her “victim,” the U.S. Government, was negligible, as reflected in the nominal sentence that she received relative to the heavier (though still light) sentence imposed on Lagunas-Salgado.
Marin-Rodriguez is closer to our case, but the alien in that case had been convicted under a different statute, 18 U.S.C. § 1546, which is entitled “Fraud and misuse of visas, permits, and ■ other documents,” authorizes sentences of up to 10 years in prison (even longer if the offense was committed in connection with drug trafficking or terrorism), and thus punishes more heavily conduct more reprobated than the conduct in which the petitioner in this case engaged. The court in Marin-Rodriguez was mistaken, however, as I’ve said, in assuming that all deceptive acts, no matter how harmless, are crimes of moral turpitude. See 710 F.3d at 738. It based that proposition on De George, Abdelqa-dar, and Padilla, despite the fact that none of those cases involved harmless deception.
If anything is clear it’s that “crime of moral turpitude” shouldn’t be defined by invoking broad categorical rules that sweep in harmless conduct. Yet that’s what the Board of Immigration Appeals did in this case, in upholding the immigration judge’s conclusion that the petitioner had committed a crime of moral turpitude; it said that a violation of 42 U.S.C § 408(a)(7)(B) is “categorically a crime involving moral turpitude.”