Joni Aggoubi ZAITONA, Petitioner,

v.

IMMIGRATION and NATURALIZATION
SERVICE, Respondent.

No. 92–4279.

United States Court of Appeals,
Sixth Circuit.

Submitted Sept. 21, 1993.

Decided Oct. 18, 1993.

Fakhri W. Yono (briefed), Yono & Sarafa, Farmington Hills, MI, for petitioner.

Alison R. Drucker, Robert Kendall, Jr., Alexander H. Shapiro (briefed), U.S. Dept. of Justice, Immigration Litigation, Civ. Div., Washington, DC, Barbara L. Beran, Office of the U.S. Atty., Columbus, OH, for respondent.

Before: KENNEDY and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.

RYAN, Circuit Judge.

Petitioner Joni Zaitona appeals from the decision of the Board of Immigration Appeals which dismissed Zaitona's appeal of the immigration judge's denial of his motion to

terminate deportation proceedings. Zaitona contends that the Board erred in concluding he was deportable for having committed two crimes of moral turpitude. He argues that one conviction should not be considered because the sentencing court made a judicial recommendation against deportation, and that the remaining conviction should not be considered because it was not for a crime of moral turpitude.

Finding no error, we affirm the Board's decision.

## I.

On October 18, 1979, Zaitona immigrated to the United States from Iraq. The INS began seeking his deportation in June 1982, following Zaitona's three criminal convictions in Michigan state court. The INS served Zaitona with an Order to Show Cause and Notice alleging that as a result of his convictions he was deportable for having committed two crimes of moral turpitude, pursuant to 8 U.S.C. § 1251(a)(4). At a deportation hearing in May 1983, petitioner admitted to the convictions, and chose deportation over voluntary departure. In October 1983, the Board of Immigration Appeals (BIA) dismissed Zaitona's appeal, a decision that was affirmed by this court.[1] In May 1986, however, the BIA granted a motion to reopen the proceedings based on new developments, and remanded Zaitona's case to the immigration judge (IJ). This appeal arises from the reopened proceedings.

As already mentioned, the record before this court shows that Zaitona has been convicted three times in Michigan courts. He was first convicted in January 1982, after pleading guilty to felonious assault with a knife. Subsequent to the INS's instituting deportation proceedings against Zaitona, though, this conviction was reduced to aggravated assault. All parties agree that aggravated assault is not a crime involving moral turpitude. Accordingly, neither the IJ nor the BIA considered this crime as a factor bearing on Zaitona's deportability.

Zaitona's second conviction came in March 1982, after he pled guilty to one count of larceny in a building. This conviction was then set aside in January 1985, after Zaitona's lawyer filed a motion with the Oakland County Circuit Court asserting, *inter alia,* that he had failed to ask for a judicial recommendation against deportation (JRAD) on Zaitona's behalf. Zaitona then again pled guilty to the same crime in August 1985, but on this occasion, the judge recommended that Zaitona not be deported.

Finally, Zaitona was convicted in April 1982 of making a false statement in an application for a driver's license after he applied for, and received, a license using the false name of Joni Osef, and using a false date of birth.[2] The sentencing judge opined that "what we have here is a concealment of a material fact, that he had a prior license already in another name when he applied for a second license."

After this case was reopened in 1986, the IJ treated Zaitona's arguments as presenting a motion to terminate deportation proceedings. In October 1987, the IJ denied the motion, and reinstated the original order of deportation, concluding (1) that the JRAD given for the larceny conviction was ineffective because the original conviction had been set aside only for the purpose of obtaining the JRAD, and (2) that the crime of making a false statement was a crime of moral turpitude. The BIA affirmed the IJ's disposition of the case in November 1992, essentially adopting the IJ's rationale. It too held that the JRAD was ineffective because "the sole purposes [sic] in setting aside the prior conviction [was] to correct the omission of failing to make a recommendation initially," and that Zaitona's false statement conviction was a crime of moral turpitude because the state court transcript showed it to be a conviction for "the concealment of a material fact." Concluding that "the arguments made on

---

**1.** *Zaitona v. INS,* No. 84–3020, table at 751 F.2d 388 (6th Cir.1984) (unpublished disposition).

**2.** The record indicates that Zaitona was originally charged with perjury in connection with this incident, but pled guilty to the false statement charge, a lesser included offense classified as a misdemeanor.

appeal [were] without merit," the BIA consequently dismissed the appeal.

Zaitona filed this timely appeal.

## II.

■ This court has jurisdiction to review all final orders of deportation. 8 U.S.C. § 1105a(a). In an immigration case, the order is final after the BIA issues its opinion. *Vergara–Molina v. INS,* 956 F.2d 682, 684 (7th Cir.1992). Thus, this court reviews the decision of the BIA, not of the IJ. *Id.* In deportation proceedings, the government must establish its allegations by "clear, unequivocal, and convincing evidence." *Woodby v. INS,* 385 U.S. 276, 285, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966). Once the INS has established a *prima facie* case of deportability, "[t]he burden of going forward to produce evidence of nondeportability then shifts to the petitioners." *Cabral–Avila v. INS,* 589 F.2d 957, 959 (9th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1245, 59 L.Ed.2d 472 (1979).

■ This court has not spoken to the appropriate standard of review for a case arising under the statutory section at issue here. The Fifth Circuit has articulated the following approach:

> We apply a two-prong standard of review.... We first consider the legal standard under which the INS should make the particular deportability decision. If the governing statute does not speak clearly to the question at hand, this court ... [will] uph[o]ld agency interpretations of ambiguous law when that interpretation is reasonable.... After determining the controlling legal standard, we will next examine the Board's findings under the substantial evidence test to determine whether the legal standard has been satisfied.... The substantial evidence standard requires only that the Board's conclusion be based upon the evidence presented and that it be substantially reasonable.

*Animashaun v. INS,* 990 F.2d 234, 237 (5th Cir.1993), *petition for cert. filed,* — U.S.L.W. —— (U.S. Aug. 9, 1993) (No. 93–5539); *see also* 8 U.S.C. § 1105a(a)(4); *cf.*

*Kabongo v. INS,* 837 F.2d 753, 756 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 564 (1988). We are persuaded that this approach is correct, and therefore adopt it for use in this circuit.

## III.

### A.

As already mentioned, Zaitona makes two arguments in support of his claim that the BIA improperly held him accountable for having committed two crimes of moral turpitude. His first is that at the time of his larceny conviction, his attorney did not inform him of the deportation effects of a conviction; that this amounted to ineffective assistance of counsel, making the sentence invalid; and that the thirty-day period within which a court must make a JRAD is only triggered by a valid sentence. The INS contends that in fact, the conviction was vacated for the sole purpose of enabling the court to enter a JRAD, not of remedying the alleged ineffective assistance of counsel; that this was an invalid reason for vacating the sentence; and that the JRAD issued as to Zaitona's larceny conviction is therefore ineffective. The INS further contends that Zaitona's argument regarding ineffective assistance of counsel is waived because it is raised for the first time before this court, and that it is, moreover, without factual support in the record. The INS finally argues that even if ineffective assistance had been the basis for the Michigan court's decision, the finding of ineffective assistance would have been predicated solely on the attorney's failure to ask for a JRAD, and the subsequent JRAD would therefore still be invalid.

The parties cite section 241(a) of the Immigration and Naturalization Act (INA), 8 U.S.C. § 1251(a)(4), as being the applicable statute, and it is under this statute that the INS originally instituted deportation proceedings against Zaitona. But the Immigration Act of 1990, Pub.L. No. 101–649, Title VI, § 602(a), 104 Stat. 4978, 5077 (1990), slightly amended [3] the provisions of 8 U.S.C. § 1251(a)(4) and recodified them at section

---

**3.** The amendments did not work any substantive changes.

1251(a)(2)(A). The statute now reads, in relevant part, as follows:

**§ 12.51  Deportable aliens**

**(a) Classes of deportable aliens**

. . . .

   **(2) Criminal offenses**

   **(A) General crimes**

   . . . .

      **(ii) Multiple criminal convictions**

      Any alien who at any time after entry is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.

8 U.S.C. § 1251(a)(2)(A)(ii).

Section 241(b) of the INA, 8 U.S.C. § 1251(b)(2) (1970), was a companion to the earlier version of section 241(a), and pertained to judicial recommendations against deportation in the cases of aliens subject to section 241(a). It read, in relevant part, as follows:

   (b) The provisions of subsection (a)(4) of this section respecting the deportation of an alien convicted of a crime or crimes shall not apply . . . (2) if the court sentencing such alien for such crime shall make, at the time of first imposing judgment or passing sentence, or within thirty days thereafter, a recommendation to the Attorney General that such alien not be deported. . . .

8 U.S.C. § 1251(b) (1970).[4]

■ Our standard of review dictates that this court, in its effort to determine the effectiveness of a JRAD made after a sentence has been vacated for the sole purpose of making a JRAD, first look to the language of the statute. We find the statute to be ambiguous on this score, as it does not specifically address the question of the validity of a court's reopening a criminal case for the purpose of affecting deportability. The language "at the time of first imposing judgment or passing sentence" appears not to mandate that a JRAD be made the first time a judgment is imposed, but rather refers to the necessity of making the JRAD at the time of judgment, or no later than thirty days thereafter. And there is simply no other language in the statute that could be read as shedding any light on the validity, *vel non*, of the practice the petitioner and the INS ask us to consider.

■ The court must next turn, then, to the interpretation given the statute by the agency; if it is reasonable, we should uphold that interpretation. It is beyond cavil that the INS has consistently propounded an interpretation of the statute that would disallow the JRAD made in this case, and that the BIA has adopted this position by holding, in numerous cases, that a recommendation against deportation under section 241(b) is not effective when it follows a resentencing that was held for the sole purpose of making the JRAD. In *Matter of S——*, 9 I. & N.Dec. 613 (BIA 1962), the petitioner was originally convicted of robbery in February 1960, following a plea of *non vult*.[5] In November of that year, however, the sentencing judge vacated and set aside the petitioner's plea and the sentence that had been imposed. *Id.* at 616. The sentencing court specifically stated that its only reason for doing so was that

   the court was not aware (at the time of first sentencing) that the defendant was subject to deportation as an alien . . . and that it would [therefore] be manifestly un-

---

**4.** The 1990 Immigration Act also served to repeal this section effective November 29, 1990, Pub.L. No. 101–649 at § 505, 104 Stat. at 5050, meaning that sentencing judges no longer have power to issue JRADs. The parties do not suggest that the legislative repeal has any effect in this case. *But cf. United States v. Bodre*, 948 F.2d 28, 31–33 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1487, 117 L.Ed.2d 628 (1992); *United States v. Murphey*, 931 F.2d 606, 608 (9th Cir. 1991). We assume, without deciding, that it does not.

   The decision to grant a JRAD rested within the "absolute discretion" of the district court. *Haller v. Esperdy*, 397 F.2d 211, 213 (2d Cir.1968). A judicial recommendation pursuant to this section was binding on the government. *See, e.g., Janvier v. United States*, 793 F.2d 449, 452 (2d Cir.1986).

**5.** *"Non vult"* is a variation of *"nolo contendere."*

just to subject the defendant to the additional penalty....

*Id.* at 617. Although noting that after his sentence was vacated, the defendant "was proceeded against by an accusation rather than by an indictment," the BIA nonetheless concluded that because "it is manifest that the sole basis for the vacation and reentry of judgment was to repair the omission to make the statutory recommendation against deportation," therefore, "the recommendation against deportation is not effective under the federal standard set forth in section 241(b) of the Immigration and Nationality Act." *Id.* at 618 (citing *United States ex rel. Piperkoff v. Esperdy,* 267 F.2d 72 (2d Cir.1959)); *see Matter of P——,* 9 I. & N.Dec. 293, 294 (U.S. Att'y Gen. 1961); *see also Matter of Tafoya–Gutierrez,* 13 I. & N.Dec. 342, 344 (BIA 1969); *Matter of O'Sullivan,* 10 I. & N.Dec. 320, 325, 328 (BIA 1963); *Matter of H——,* 9 I. & N.Dec. 460, 462–63 (BIA 1961).

We find this statutory interpretation eminently reasonable. In so concluding, we are not unaware that the Third Circuit reversed the BIA's decision in *Matter of S——.* The court reasoned in part as follows:

> [The INS] urges ... that if a judgment of conviction is vacated for the purpose of avoiding deportation, a subsequent recommendation is ineffectual. This argument misses the mark, for no contention is made that the state court either exceeded its jurisdiction or abused its discretion in vacating the plea of non vult together with the judgment of conviction, and subsequently dismissing the indictment. Thus, the action of the state court is concededly valid. That being so, the original judgment is as much a nullity as if the grand jury had never returned an indictment. Obviously, Congress by the use of the phrase "at the time of first imposing judgment or passing sentence" was referring to a *valid* sentence.

*Sawkow v. INS,* 314 F.2d 34, 37 (3d Cir.1963) (emphasis added). The court believed that "considerations of policy and the orderly administration of justice" required such a conclusion. *Id.* In reaching this decision, it placed great emphasis on the fact that after the sentencing court dismissed the original judgment, the state dismissed the original indictment and filed a new accusation. It stressed that "[a]lthough the factual basis for the accusation was the same as for the original indictment, it nonetheless gave rise to a new, separate and distinct criminal proceeding." *Id.* The Third Circuit appeared to believe that the substitution of a new accusation for the indictment was significant, and indicated that if the state had simply held a new trial on the basis of the old indictment, the subsequent JRAD may have been ineffective.

In light of this emphasis, peculiar to that particular case, we believe that even if *Sawkow* were binding precedent, it would not dictate the result in the case before us. But more important, since *Sawkow* is not binding, is the fact of our fundamental disagreement with the Third Circuit's reasoning. First, although holding that the second sentence was the first "valid" sentence, the court failed to indicate in what way, if any, the prior sentence had been *invalid.* That is, we too believe that the statute pertains only to the first *valid* sentence, but we find *Sawkow's* use of the term to be mere wordplay. A sentence does not become invalid simply because the defendant failed to request a JRAD. This court concludes that considerations of the "orderly administration of justice" require that a sentencing court not be permitted, three years down the line, to vacate a judgment for reasons that have nothing to do with the underlying validity of the guilty plea and original conviction themselves. Second, we believe that the type of challenge made by the INS should in fact be properly understood as a challenge to the sentencing court's authority, under federal law, to enter the JRAD under these circumstances, and as a suggestion that the sentencing court abused its discretion. We are, in short, simply unpersuaded by the Third Circuit's unsupported assertion that state court actions of this stripe are "concededly valid."

We therefore hold that when a sentencing court vacates a criminal judgment and sentence, and reenters the judgment and sentence for the sole purpose of making a JRAD and so effectively eludes the statute's thirty-

day requirement, then the JRAD is ineffective. Like the Second Circuit, which examined the statute in a different procedural posture, we conclude that holding otherwise would defeat the command of the statute, "which strictly, and for good purpose, limits the time within which the extraordinary power vested in the trial court must be exercised." *Piperkoff*, 267 F.2d at 75. To allow the state court's action to be effective would be to permit the court to do indirectly what it could not do directly, and to circumvent the federal standard.

We next examine the factual basis for the BIA's conclusions. In this regard, it is worth emphasizing that Zaitona's single challenge to the BIA's finding that the sole purpose for vacating the sentence was to issue the JRAD is his claim that his attorney's failure to initially ask for a JRAD constituted ineffective assistance of counsel, and that the state court's decision rested on this ineffective assistance. There are several problems with his argument. First, he raises it for the first time before this court, and as a "general rule . . . a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). And second, as a result, there is nothing in the record that would allow us to evaluate the validity of his claim of ineffective assistance.

But we do not find it necessary to decide the question of waiver, because it is so plain that the record reveals substantial evidence for the BIA's view that the sentencing court's action was taken for the sole purpose of relieving Zaitona from deportation. It is simply unimportant to our determination that Zaitona's attorney may have originally surrounded his request for the JRAD with language of ineffective assistance of counsel. *See Matter of B——*, 8 I. & N.Dec. 686, 688 (BIA 1960). Zaitona's motion to vacate focussed throughout on the injustice of subjecting Zaitona to deportation. And the order setting aside the conviction specifically noted the court's intention of considering a JRAD, and offered no other explanation for its action. Finally, the fact that following the vacating of his first sentence, Zaitona once again pled guilty to the identical crime, high-lights the lack of any reason *other* than the securing of a JRAD for the sentencing court's action. The JRAD was, simply, the only difference between the first and second sentencings.

We affirm the BIA's conclusion that Zaitona's conviction for larceny in a building is a conviction for a crime of moral turpitude that may be considered in deportation proceedings.

**B.**

■ We next turn to Zaitona's argument regarding the second conviction being counted against him, that for making false statements. Here, Zaitona repeats the same points that he made, unsuccessfully, to the BIA: (1) not all false statements are perjury; (2) the false statement for which he was convicted should not be considered perjurious because he was not given any warning that it would be so treated; and (3) the crime of which he was convicted falls under the Michigan Vehicle Code, not under the criminal code, and so cannot be considered a crime of moral turpitude. The INS contends that it is irrelevant that Zaitona's conviction did not rise to the level of perjury, because the only required showings are of materiality and knowledge.

Once again, upon examining 8 U.S.C. § 1251(a)(2)(A)(ii), we find that it provides no guidance to aid us in deciding how the phrase "crime of moral turpitude" should be interpreted. The INS asserts, and courts have held, that the crime of making false statements is a crime of moral turpitude when the elements of materiality and knowledge are shown. *See Matter of R——*, 2 I. & N.Dec. 819, 826–27 (BIA 1947); *cf. Kabongo*, 837 F.2d at 758; *United States ex rel. Karpay v. Uhl*, 70 F.2d 792, 792 (2d Cir.), *cert. denied*, 293 U.S. 573, 55 S.Ct. 85, 79 L.Ed. 671 (1934); *Matter of Correa–Garces*, No. A–29111329, Int.Dec. 3169, 1992 WL 195803, 1992 BIA LEXIS 4 (BIA March 27, 1992); *Matter of S——*, 4 I. & N.Dec. 509, 509 (BIA 1952). We find this to be a reasonable interpretation of the statute, and indeed, Zaitona does not argue for any other interpretation.

438

We next turn to Mich.Comp.Laws Ann. § 257.324(1)(e), the statute which Zaitona was convicted of having violated. It reads in relevant part as follows:

> Sec. 324. (1) A person shall not do any of the following:
>
> . . . .
>
> (e) Use a false or fictitious name or give a false or fictitious address in an application for an operator's or chauffeur's license, or any renewal or duplicate of an operator's or chauffeur's license, or *knowingly make a false statement or knowingly conceal a material fact* or otherwise commit a fraud in making an application.

(Emphasis added.) As is clear from the text of the statute, materiality and knowledge are elements of the crime to which Zaitona pled guilty. And we note that, once again, Zaitona does not actually contest the BIA's legal conclusion that materiality and knowledge are both elements of this crime.

Finally, Zaitona does not contest the BIA's factual finding that both elements were present in his case. And in light of the explicit statements made by the sentencing court, we must conclude that there was substantial evidence underlying the BIA's findings on this score.

In short, the challenges Zaitona presents are simply not relevant to the determination to be made in this case. We conclude that the BIA did not err in holding that Zaitona's conviction under Mich.Comp.Laws Ann. § 257.324(1)(e) was a crime of moral turpitude.

**AFFIRMED.**