In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2839

MARIA EUDOFILIA ARIAS,

*Petitioner*,

*v.*

LORETTA E. LYNCH,
Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A087 774 871

ARGUED OCTOBER 30, 2015 — DECIDED AUGUST 24, 2016

Before POSNER, RIPPLE, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Petitioner Maria Eudofilia Arias came to this country without authorization in 2000. She has raised three children here. Her longtime employer calls her an "excellent employee." She now faces removal from the United States after the Board of Immigration Appeals characterized her sole criminal conviction—falsely using a social security number to work—as a "crime involving moral turpitude."

This characterization bars Arias from seeking discretionary cancellation of removal under 8 U.S.C. § 1229b(b)(1). Arias has petitioned for review of the removal order.

We grant the petition and remand the case to the Board for further proceedings. Arias was convicted under a statute making it a federal crime to misrepresent a social security number to be one's own "for *any … * purpose." 42 U.S.C. § 408(a)(7)(B) (emphasis added). Many violations of that statute would amount to crimes involving moral turpitude. For both legal and pragmatic reasons, though, we doubt that every violation of the statute necessarily qualifies as a crime involving moral turpitude.

We remand this case on two narrower grounds. First, the Board misapplied the framework for identifying crimes involving moral turpitude that it was bound to apply at the time of its decision. See *Matter of Silva-Trevino (Silva-Trevino I)*, 24 I. & N. Dec. 687 (Att'y Gen. 2008) (establishing framework). Then, after the Board's decision but before Arias's petition for our review became ripe for decision, the Attorney General vacated the *Silva-Trevino I* framework in its entirety. See *Matter of Silva-Trevino (Silva-Trevino II)*, 26 I. & N. Dec. 550, 554 (Att'y Gen. 2015). Given the Board's legal error and the current vacuum of authoritative guidance on how the Board should determine whether a crime involves moral turpitude, we remand to the Board to reconsider Arias's case.

In Part I, we recount the factual and procedural background of this case. In Part II, we examine the difficulty in treating violations of § 408(a)(7)(B) categorically as crimes involving moral turpitude. In Part III, we explain the reasons for our remand based on the Board's legal error and the current

uncertainty about how the Board should decide whether a conviction is for a crime involving moral turpitude.

I.  *Factual and Legal Background*

Since coming to the United States from Ecuador without authorization in 2000, Arias has worked for the Grabill Cabinet Company in Grabill, Indiana. The company called Arias an "excellent employee" in a letter Arias submitted to the immigration court in support of her application for cancellation of removal. To work for Grabill Cabinet, Arias provided a false social security number. She has presented evidence that she has filed an income tax return for every year she has been in the United States through 2012.

Arias has also raised a family in the United States. Arias and her husband have been married since 1989. Their three children have grown up in the United States. The two younger children, five and fourteen years old, are United States citizens. Her oldest child, twenty-six years old, was born in Ecuador but has received relief from removal through the Deferred Action for Childhood Arrivals program.

In 2010, Arias was charged in federal court with falsely using a social security number to work for Grabill Cabinet in violation of 42 U.S.C. § 408(a)(7)(B). Section 408(a)(7)(B) makes it a crime to misrepresent a social security number to be one's own to obtain a benefit or "for any other purpose." Arias pled guilty and was sentenced to just about the lightest felony sentence one is likely to find in modern federal practice: one year of probation and a $100 special assessment. After Arias completed her probation successfully, she received employment authorization and Grabill Cabinet rehired her. In

the letter from the company that Arias submitted to the immigration court, Grabill Cabinet said that it "did not have any problems" welcoming her back to her old job. Her indictment charged Arias with an "intent to deceive Grabill," although it is evident that Grabill itself did not have a problem with Arias's deception and does not view itself as a victim. There is no indication in the record that Arias has broken any state or federal laws other than her unauthorized immigration into this country and false use of a social security number to work.

In 2010, Arias received a notice to appear for removal proceedings. She admitted removability but applied for cancellation of removal under 8 U.S.C. § 1229b(b)(1). The Attorney General may cancel the removal of unauthorized immigrants who have been in the United States for at least ten years and who can show that their removal would cause "exceptional and extremely unusual hardship" to their children, spouses, or parents who are United States citizens, among other requirements. *Id*.

Such discretionary cancellation is barred, however, if the immigrant has been convicted of a "crime involving moral turpitude." 8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1229b(b)(1)(C). "Moral turpitude" is not defined in the statute. The Board and federal courts have labored for generations to provide a workable definition. See generally *Jordan v. De George*, 341 U.S. 223, 227–29 (1951) (holding that conspiracy to evade payment of liquor tax was crime involving moral turpitude, and noting that all varieties of fraud are treated likewise); *id*. at 232–45 (Jackson, J., dissenting) ("moral turpitude" is too vague to support deportation).

The immigration judge held that Arias's crime of conviction was a crime involving moral turpitude. The judge relied

on two of this circuit's cases: *Marin-Rodriguez v. Holder*, 710
F.3d 734 (7th Cir. 2013), and *Miranda-Murillo v. Holder*, 502 F.
App'x 610 (7th Cir. 2013), a non-precedential order. A one-
member panel of the Board affirmed. The Board said it was
using the categorical approach, the first step in the now-va-
cated *Silva-Trevino I* framework, to determine that a violation
of § 408(a)(7)(B) necessarily involves moral turpitude. See
*Silva-Trevino I*, 24 I. & N. Dec. at 689–90. Citing this court's
opinion in *Marin-Rodriguez*, 710 F.3d at 738, the Board held:
"An intent to deceive for the purpose of wrongfully obtaining
a benefit is an element of the offense, and therefore the offense
is categorically a crime involving moral turpitude."

Arias petitioned for judicial review of the Board's decision
denying cancellation of removal. Under 8 U.S.C.
§ 1252(a)(2)(D), we have jurisdiction to review the legal ques-
tion whether a crime involves moral turpitude. *Lagunas-Sal-
gado v. Holder*, 584 F.3d 707, 710 (7th Cir. 2009). Arias argues
that her crime of conviction does not categorically involve
moral turpitude because, while the statute requires deception,
it does not always require fraud, which necessarily involves
detriment to the person or entity defrauded. Arias presented
these arguments to the Board sufficiently to allow our review,
and, in any case, the Board's discussion of deceit in the context
of moral turpitude opens up that issue for our review. See
*Arobelidze v. Holder*, 653 F.3d 513, 517 (7th Cir. 2011); *Juarez v.
Holder*, 599 F.3d 560, 564 n.3 (7th Cir. 2010).

## II. *Crimes Involving Moral Turpitude*

The issue is whether a violation of 42 U.S.C. § 408(a)(7)(B)
is a crime involving moral turpitude. We have not decided the
issue in a precedential opinion, and other circuits are split.

The Fifth and Eighth Circuits have said yes (including opin-
ions    regarding    the    closely    related    subparagraph,
§ 408(a)(7)(A)). *Guardado-Garcia v. Holder*, 615 F.3d 900, 901–02
(8th Cir. 2010); *Lateef v. Department of Homeland Security*, 592
F.3d 926, 929 (8th Cir. 2010) (§ 408(a)(7)(A)); *Hyder v. Keisler*,
506 F.3d 388, 392 (5th Cir. 2007) (§ 408(a)(7)(A)). The Ninth
Circuit has said no. *Beltran-Tirado v. I.N.S.*, 213 F.3d 1179, 1184
(9th Cir. 2000).

The Board has defined a crime involving moral turpitude
as "conduct that shocks the public conscience as being inher-
ently base, vile, or depraved, and contrary to the accepted
rules of morality and the duties owed between persons or to
society in general." *In re Solon*, 24 I. & N. Dec. 239, 240 (BIA
2007) (citation and internal quotation marks omitted). We
have adopted definitions substantively in line with the
Board's. See, e.g., *Sanchez v. Holder*, 757 F.3d 712, 715 (7th Cir.
2014); see also *Padilla v. Gonzales*, 397 F.3d 1016, 1019 (7th Cir.
2005) ("We have recently stated that a crime of moral turpi-
tude is one that is deliberately committed and 'serious,' either
in terms of the magnitude of the loss that it causes or the in-
dignation that it arouses in the law-abiding public."), over-
ruled on other grounds by *Ali v. Mukasey*, 521 F.3d 737, 743
(7th Cir. 2008); see generally Julia Ann Simon-Kerr, *Moral Tur-
pitude*, 2012 Utah L. Rev. 1001, 1044–68 (2012) (recounting his-
tory of moral turpitude as a concept in immigration law).

Taking the Board's definition at face value, it is difficult to
see how a violation of § 408(a)(7)(B) is categorically a crime
involving moral turpitude. In fact, the Board reached its deci-
sion in this case by misstating the provisions of the statute.
The Board wrote incorrectly that § 408(a)(7)(B) has as a neces-

sary element an "intent to deceive for the purpose of wrong-fully obtaining a benefit." That is not correct. The statute criminalizes falsely representing a social security number to be one's own for purposes of obtaining various social security benefits but also "for *any* other purpose."

It is not difficult to imagine some purposes for which falsely using a social security number would not be "inherently base, vile, or depraved." For example, hospitals and other health care providers often ask for patients' social security numbers. Would it be "inherently base, vile, or depraved" for a person without a social security number to take a child who has fallen ill to a hospital and to give a false social security number to obtain treatment for her sick child, knowing she is ready, willing, and able to pay for the care? Not unless the terms "base, vile, or depraved" have ceased to have any real meaning.

Courts and the Board do not always apply the above definition according to its literal terms. They instead often use two heuristics to decide what is "inherently base, vile, or depraved" and what is not. First, crimes that are *malum in se* (inherently wrong), as opposed to *malum prohibitum* (wrong only because prohibited), are often said to involve moral turpitude. See, e.g., *Padilla*, 397 F.3d at 1020; *In re Fualaau*, 21 I. & N. Dec. 475, 477 (BIA 1996) ("Moral turpitude has been defined as an act which is per se morally reprehensible and intrinsically wrong, or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude."); *Matter of Flores*, 17 I. & N. Dec. 225, 227 (BIA 1980). Second, courts and the Board have focused on the presence of a "vicious motive" or an "evil intent" to deter-

mine whether a crime involves moral turpitude. See, e.g., *Fernandez-Ruiz v. Gonzales*, 468 F.3d 1159, 1165–66 (9th Cir. 2006); *Partyka v. Attorney General*, 417 F.3d 408, 413 (3d Cir. 2005); *Flores*, 17 I. & N. Dec. at 227 ("The test to determine if a crime involves moral turpitude is whether the act is accompanied by a vicious motive or a corrupt mind."); see generally Simon-Kerr, *supra*, 2012 Utah L. Rev. at 1059–68 (recounting history of scienter test for moral turpitude).

The broad "any other purpose" term in § 408(a)(7)(B) makes it difficult to see how a violation of the statue could *categorically* involve evil intent or be *malum in se*. There need not be any evil intent in the hypothetical about a parent using a false social security number to secure medical care for a sick child, unless deception without more, no matter how admirable the goal, involves evil intent (i.e., moral turpitude). Along those same lines, it seems like giving a false social security number "for any … purpose" should not be categorically *malum in se* or inherently wrong. The Ninth Circuit has held that a violation of § 408(a)(7)(B) is not *malum in se*. *Beltran-Tirado*, 213 F.3d at 1183–84 (reasoning that Congress could not have intended violations of § 408(a)(7)(B) to be crimes involving moral turpitude because of legislative history indicating that unauthorized immigrants exempt from prosecution under § 408 under an amnesty program should not be considered to have exhibited moral turpitude). But see *Marin-Rodriguez*, 710 F.3d at 740–41 (rejecting *Beltran-Tirado*'s legislative history argument).

We acknowledge that the Board's holding that Arias's violation of § 408(a)(7)(B) categorically is a crime involving moral turpitude does have a basis in law. Despite the confusion about how to determine what moral turpitude is, there is a

consensus that fraud is close to the core of moral turpitude. In *Jordan v. De George*, the Supreme Court rejected an argument that the moral turpitude standard was unconstitutionally vague in the case of an immigrant facing deportation for conspiring to defraud the United States of liquor taxes. The Court reasoned: "Whatever else the phrase 'crime involving moral turpitude' may mean in peripheral cases, the decided cases make it plain that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude." 341 U.S. at 232; see also Simon-Kerr, *supra*, 2012 Utah L. Rev. at 1008 (arguing that legal concept of moral turpitude developed from eighteenth- and nineteenth-century "honor norms" and therefore includes "oath-breaking, fraud, and their extensions" as part of its "core of settled meaning") (internal quotation marks omitted).

We and other courts have sometimes used broader language, writing that any crime involving the larger concept of "deception," in contrast to the narrower concept of fraud, involves moral turpitude. See, e.g., *Marin-Rodriguez*, 710 F.3d at 738 ("Crimes entailing an intent to deceive or defraud are unquestionably morally turpitudinous."); *Guardado-Garcia*, 615 F.3d at 902 ("Crimes involving the intent to deceive or defraud are generally considered to involve moral turpitude.") (citation and internal quotation marks omitted); *Hyder*, 506 F.3d at 391 ("We have repeatedly emphasized that crimes whose essential elements involve fraud or deception tend to be CIMTs."); *Abdelqadar v. Gonzales*, 413 F.3d 668, 671 (7th Cir. 2005) ("Crimes entailing deceit or false statement are within the core of the common-law understanding of 'moral turpitude.'"). In *Padilla*, in deciding that obstruction of justice was a crime involving moral turpitude, we wrote: "Crimes that do not involve fraud, but that include dishonesty or lying as an

essential element also tend to involve moral turpitude." 397 F.3d at 1020 (citation and internal quotation marks omitted).

But note the qualifier, "tend to." Despite the broad language, cases finding crimes of moral turpitude based on deception rely on other aggravating factors, especially actual or intended harm to others. See *Abdelqadar*, 413 F.3d at 670 (buying food stamps for cash from proper recipients); *Padilla*, 397 F.3d at 1017–18 (obstruction of justice by giving false information to police officer); see also *Guardado-Garcia*, 615 F.3d at 902 (using false social security number to gain access to secure area of major airport).

There is also a basis in Board precedents, which are also entitled to our deference, for the idea that a crime involving moral turpitude requires more than simple dishonesty. In tort law, liability for fraud requires loss to the person defrauded. See Restatement (Second) of Torts § 531. Some Board precedents seem to follow this distinction. For example, in *Matter of Delagadillo*, the Board held that the violation of a Mexican anti-fraud statute was not categorically a crime involving moral turpitude. 15 I. & N. Dec. 395, 396–97 (BIA 1975). The Board reasoned that the statute as written did not "require the taking of another's property." *Id.* at 396. Because the statute "could therefore punish any act of deception used in retrieving one's own property" it did not categorically involve moral turpitude. *Id.* The Board then looked to the specific facts of the conviction at issue. The Board held that the immigrant's actions—fabrication of a property transfer "in an unsuccessful attempt to reduce his wife's potential settlement in a divorce action"—was not "so base or vile as to be deemed morally turpitudinous under United States standards." *Id.* at 397. Similarly, in *Matter of B— M—*, the Board held that making a false

statement to an immigration inspector was not a crime involving moral turpitude because "the offense may have consisted only of a false and not a fraudulent statement." 6 I. & N. Dec. 806, 808 (BIA 1955). But see *Matter of P-----*, 6 I. & N. Dec. 795, 798 (BIA 1955) (holding that conviction under statute containing "inherent intent to deceive or mislead" was crime involving moral turpitude).

Arias's case brings into focus the troubling results that would follow from a rule that every crime that involves any element of deception involves moral turpitude. As of 2014, unauthorized immigrants made up about five percent of the United States labor force. Jens Manuel Krogstad & Jeffrey S. Passel, *5 Facts About Illegal Immigration in the U.S.*, Pew Research Center (November 19, 2015), *available at* http://www.pewresearch.org/fact-tank/2015/11/19/5-facts-about-illegal-immigration-in-the-u-s. Has every one of those millions of workers who gives a social security number to her employer committed a crime involving moral turpitude? Those persons are removable because they are not in the United States lawfully. The issue for Arias and all the others is whether they are barred from even discretionary relief because they have provided false social security numbers so that they can work and pay taxes.

It seems inconsistent with the terms "base, vile, or depraved" to hold that an unauthorized immigrant who uses a false social security number so that she can hold a job, pay taxes, and support her family would be guilty of a crime involving moral turpitude, while an unauthorized immigrant who is paid solely in cash under the table and does not pay any taxes would not necessarily be guilty of a crime involving

moral turpitude. A rule that all crimes that involve any ele-
ment of deception categorically involve moral turpitude
would produce results at odds with the accepted definition of
moral turpitude as conduct that is "inherently base, vile, or
depraved." At the same time, there is significant precedent in-
dicating that deceptive conduct is morally turpitudinous. In
the end, though, we do not need to try to resolve this conflict
definitively in this case. As we explain next, we remand be-
cause of the unsettled state of the law regarding how the
Board must go about determining which crimes involve
moral turpitude.

III. *The Changing Legal Framework*

Given the difficulty that courts and the Board have had in
defining the boundaries of moral turpitude, perhaps we
should not be surprised to find great uncertainty regarding
how the Board should decide whether an immigrant has been
convicted of a crime involving moral turpitude. In between
the Board's order and the briefing in Arias's petition for our
review, the Attorney General vacated the order that had set
the approach the Board used to determine that Arias's crime
involved moral turpitude. No replacement framework has yet
emerged. The current uncertainty about method and an error
the Board made in applying the old framework warrant a re-
mand to the Board to reconsider Arias's conviction under a
new framework the Board adopts or the Attorney General
mandates. See *Mata-Guerrero v. Holder*, 627 F.3d 256, 257 (7th
Cir. 2010) (remanding to the Board a decision that a crime in-
volved moral turpitude because Board had used an approach
that had since been replaced by *Silva-Trevino I* framework).

In 2008, the Attorney General established a three-step process for determining whether a crime involved moral turpitude. See *Silva-Trevino I*, 24 I. & N. Dec. 687 (Att'y Gen. 2008). Step one of *Silva-Trevino I* used the categorical approach, looking to the elements of the statute of conviction to determine whether there is a "realistic probability" that the statute could be applied to conduct that does not involve moral turpitude. Where step one was inconclusive, step two looked beyond the statutory elements to records of conviction, such as charging documents, jury instructions, and guilty plea agreements and transcripts to see if the defendant's crime involved moral turpitude. Where that was also inconclusive, step three allowed an immigration judge or the Board to consider additional evidence regarding the defendant's actual conduct.

We approved the *Silva-Trevino I* approach. *Sanchez v. Holder*, 757 F.3d 712, 718 (7th Cir. 2014); *Mata-Guerrero*, 627 F.3d at 260; see also *Bobadilla v. Holder*, 679 F.3d 1052, 1057 (8th Cir. 2012). Some other circuits, however, held that allowing an immigration judge to look beyond the record of conviction violated the unambiguous language of the statute. See, e.g., *Silva-Trevino v. Holder*, 742 F.3d 197, 198 (5th Cir. 2014); *Olivas-Motta v. Holder*, 746 F.3d 907, 916 (9th Cir. 2013); *Prudencio v. Holder*, 669 F.3d 472, 484 (4th Cir. 2012). In light of these other circuits' decisions, the Attorney General vacated *Silva-Trevino I* and directed the Board to address in appropriate cases how "adjudicators are to determine whether a particular criminal offense is a crime involving moral turpitude" under the Immigration and Nationality Act. *Silva-Trevino II*, 26 I. & N. Dec. 550, 553 (Att'y Gen. 2015). The Board has not yet acted on that instruction, leaving a vacuum of authority regarding how it should determine whether a crime involves moral turpitude.

To add to the confusion, the Board did not correctly apply the *Silva-Trevino I* framework in its opinion holding that Arias's violation of § 408(a)(7)(B) involved moral turpitude. The Board selectively quoted the statute and then stated: "An intent to deceive for the purpose of wrongfully obtaining a benefit is an element of the offense, and therefore the offense is categorically a crime involving moral turpitude." As noted above, § 408(a)(7)(B) criminalizes false use of a social security number not only to obtain a benefit but also "for any other purpose." The Board rephrased the statute to fit Arias's particular circumstances, which indicates that the Board looked beyond the statute to determine that Arias's crime of conviction involved moral turpitude. This was permissible under *Silva-Trevino I*, but only if examination of the statute proved inconclusive. *Silva-Trevino I*, 24 I. & N. Dec. at 690.[1]

The Board failed to analyze whether the statute was inconclusive before looking beyond the elements of the statute. This was an error under *Silva-Trevino I*. It is unclear whether it would be an error now. Since *Silva-Trevino II*, it is uncertain whether and under what circumstances the Board will be permitted to look beyond the elements of the statute. In addition, in light of *Silva-Trevino II*, our decision today does not amount to overruling our earlier opinion in *Marin-Rodriguez*. 710 F.3d 734. That decision was grounded in the now-vacated framework *of Silva-Trevino I*. Because the *Silva-Trevino I* framework

---

[1] Although the Board's interpretation of whether a crime involves moral turpitude for the purposes of the Immigration and Nationality Act is often entitled to *Chevron* deference, *Ali v. Mukasey*, 521 F.3d 737, 739 (7th Cir. 2008), *Chevron* deference does not protect clear legal errors such as the Board's misapplication of the *Silva-Trevino I* framework or misstatement regarding the contents of 42 U.S.C. § 408(a)(7)(B).

has since been vacated and the Attorney General has directed the Board to determine a new framework for judging which crimes involve moral turpitude, we REMAND to the Board to consider Arias's case under an appropriate legal framework for judging moral turpitude.

POSNER, *Circuit Judge*, concurring in the judgment. I agree that we should grant the petition and therefore remand the case to the Board of Immigration Appeals for reconsideration of the Board's refusal to cancel the order that the petitioner be removed (deported) from the United States.

I do not however agree with the respect that Judge Hamilton's opinion accords the concept of "moral turpitude." It is preposterous that that stale, antiquated, and, worse, meaningless phrase should continue to be a part of American law. Its meaninglessness is well illustrated by this case; and even if it is to be retained in immigration law it was misapplied by the Board of Immigration Appeals.

The concept plays a particularly malign role in immigration adjudication, as this case illustrates, because conviction of a crime involving moral turpitude bars the Attorney General from canceling the removal, or adjusting the status, of an alien. See 8 U.S.C. §§ 1229b(b)(1)(C), 1182(a)(2)(A)(i)(I).

The term "crime involving moral turpitude" first appeared in *Brooker v. Coffin*, 5 Johns. 188 (N.Y. 1809); see Note, "Crimes Involving Moral Turpitude," 43 *Harv. L. Rev.* 117, 118 n. 7 (1929). Without defining the term, the court concluded that prostitution and other disorderly-conduct offenses were not crimes of moral turpitude, and therefore falsely accusing someone of such an offense could not support a suit for slander. *Brooker v. Coffin*, *supra*, 5 Johns. at 191–92. But the term appeared rarely in case law until legislators began to invoke it, notably in the closing years of the nineteenth century, when in the Act of March 3, 1891, ch. 551, 51st Cong., 2d Sess., Congress, worried by the swelling tide of immigration to the United States, forbade the admission, among other categories of disfavored aliens (such as polyg-

amists), of aliens "who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude." Why Congress chose the term "moral turpitude" to describe crimes that should bar aliens is unclear because there was no attempt to explain it either in the statute itself or in the legislative history. See Staff of House Committee on the Judiciary, 100th Cong., *Grounds for Exclusion of Aliens Under the Immigration and Nationality Act: Historical Background and Analysis* 10 (Comm. Print. 1988).

Congress has never defined "moral turpitude," but courts and the immigration agencies have tended to adopt a slight variant of the definition in *Black's Law Dictionary*: an "act of baseness, vileness, or the depravity in private and social duties which man owes to his fellow man, or to society in general … . [An] act or behavior that gravely violates moral sentiment or accepted moral standards of [the] community and is a morally culpable quality held to be present in some criminal offenses as distinguished from others." *Black's Law Dictionary* 1008–09 (6th ed. 1990). Thus *Lagunas-Salgado v. Holder*, 584 F.3d 707, 710 (7th Cir. 2009), remarked that "the BIA has described a crime of moral turpitude as including 'conduct that shocks the public conscience as being inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general.'" The most recent edition of *Black's* offers a simpler but broader definition: "conduct that is contrary to justice, honesty, or morality; esp., an act that demonstrates depravity." *Black's Law Dictionary* 1163 (10th ed. 2014).

It's difficult to make sense of these definitions, which approach gibberish yet are quoted deferentially in countless

modern opinions. See, e.g., *Blake v. Carbone*, 489 F.3d 88, 103 (2d Cir. 2007); *De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 636 (3d Cir. 2002); *Hamdan v. INS*, 98 F.3d 183, 186 (5th Cir. 1996); *In re Solon*, 24 I. & N. Dec. 239, 240 (BIA 2007); *In re Ajami*, 22 I. & N. Dec. 949, 950 (BIA 1999). What does "the public conscience" mean? What does "inherently base, vile, or depraved"—words that have virtually dropped from the vocabulary of modern Americans—mean and how do any of these terms differ from "contrary to the accepted rules of morality"? How for that matter do the "accepted rules of morality" differ from "the duties owed between persons or to society in general"? And—urgently—what is "depravity"? A partial list of its synonyms, according to a Google search, includes corruption, vice, perversion, deviance, degeneracy, immorality, debauchery, dissipation, profligacy, licentiousness, lechery, prurience, obscenity, indecency, a wicked or morally corrupt act, the innate corruption of human nature due to original sin, moral perversion, bestiality, flagitiousness, and putrefaction.

The definitions constitute a list of antiquated synonyms for bad character, and why does the legal profession cling to antiquated synonyms? Why are we so backward-looking? The answer lies in the American legal culture—in the fact that law is backward-looking, that the legal profession revels in antiquity, cherishes jargon, and lacks respect for proper English usage—"base or vile" is not an expression used by sophisticated speakers of modern English, or for that matter unsophisticated, and the word "turpitude" has disappeared from the language as spoken and written today. The language I quoted from *Black's*—who talks like that? Who *needs* to talk like that? Lawyers apparently, and they go a step fur-

ther into the lexical mud by intoning an adjectival form of "turpitude": "turpitudinous."

We suggested in *Mei v. Ashcroft*, 393 F.3d 737, 741 (7th Cir. 2004)—a case that hinted at misgivings about the utility of moral turpitude as a criminal category—that the distinction between crimes that are and crimes that are not crimes of moral turpitude

> corresponds, as noted in *Beltran-Tirado v. INS*, 213 F.3d 1179, 1184 (9th Cir. 2000), and *Orlando v. Robinson*, 262 F.2d 850, 851 (7th Cir. 1959), to the distinction between crimes that are malum in se and crimes that are malum prohibitum. The former refer to crimes that because they violate the society's basic moral norms are known by everyone to be wrongful, the latter to crimes that are not intuitively known to be wrongful. *United States v. Urfer*, 287 F.3d 663, 666 (7th Cir. 2002); *United States v. Beavers*, 206 F.3d 706, 710 (6th Cir. 2000) ("the lack of intuitive wrongfulness is the hallmark of all laws that are *malum prohibitum*"). In application, however, the distinction turns out to be paper thin. In South Carolina, for example, simple possession of cocaine is classified as a crime involving moral turpitude, *State v. Major*, 301 S.C. 181, 391 S.E.2d 235, 237 (1990), but simple possession of marijuana is not. *State v. Harvey*, 275 S.C. 225, 268 S.E.2d 587, 588 (1980). An alien convicted of making false statements on an employment application and using a fake Social Security number was held in *Beltran-Tirado v. INS, supra,* not to have committed a crime involving moral turpitude, but the crime of making false statements in a driver's license application was held in *Zaitona v. INS,* 9 F.3d 432 (6th Cir. 1993), to involve moral turpitude. The holdings of the Board of Immigration Appeals are consistent with regard to some crimes but "there are a number of miscellaneous cases involving indecent acts,

gambling, perjury, and other crimes where the findings of moral turpitude vary widely." *Toutounjian v. INS*, 959 F. Supp. 598, 603 (W.D.N.Y. 1997).

The background that I have sketched may help prepare the reader for the mysterious ways in which the federal government classifies crimes against itself (for that is the nature of the crime that the petitioner in this case, Maria Arias, committed—a crime against the government) as "turpitudinous" or not.

The *U.S. Department of State Foreign Affairs Manual* (FAM), in Volume 9 Visas, 9 FAM 40.21(a) N2.3-2 Crimes Committed Against Governmental Authority (2015), divides crimes against government into those that are, and those that are not, crimes of moral turpitude:

> a. Crimes committed against governmental authority which fall within the definition of moral turpitude include:
> (1) Bribery;
> (2) Counterfeiting;
> (3) Fraud against revenue or other government functions;
> (4) Mail fraud;
> (5) Perjury;
> (6) Harboring a fugitive from justice (with guilty knowledge); and
> (7) Tax evasion (willful).
>
> b. Crimes committed against governmental authority, which would not constitute moral turpitude for visa-issuance purposes, are, in general, violation of laws which are regulatory in character and which do not involve the element of fraud or other evil intent. The following list assumes that the statutes involved do not require the showing of an intent to defraud, or evil intent:

(1) Black market violations;
(2) Breach of the peace;
(3) Carrying a concealed weapon;
(4) Desertion from the Armed Forces;
(5) Disorderly conduct;
(6) Drunk or reckless driving;
(7) Drunkenness;
(8) Escape from prison;
(9) Failure to report for military induction;
(10) False statements (not amounting to perjury or involv-ing fraud);
(11) Firearms violations;
(12) Gambling violations;
(13) Immigration violations;
(14) Liquor violations;
(15) Loan sharking;
(16) Lottery violations;
(17) Possessing burglar tools (without intent to commit burglary);
(18) Smuggling and customs violations (where intent to commit fraud is absent);
(19) Tax evasion (without intent to defraud); and
(20) Vagrancy.

The division between the two lists is arbitrary. The first is open-ended and therefore provides incomplete guidance on how to avoid committing a crime of moral turpitude against the government. The second list, the list of crimes that do *not* involve moral turpitude, includes a number of crimes that are as serious, as "turpitudinous"—one steeped in the jargon of crimes of moral turpitude might say—as those in the first list: desertion from the Armed Forces, prison escape, smuggling, and failure to report for military induction (i.e., draft dodging, when there is a draft). Some of the crimes in the second list make no sense, such as possessing burglar tools

without intent to commit burglary and committing tax evasion without intent to defraud. Others are defined so broadly as to include criminal behavior serious enough to belong on the first list, examples being breach of the peace, firearms violations, and loan sharking. The pair of lists seems the product of a disordered mind. They make no sense.

The petitioner's crime was the use of a social security number that had been assigned to another person by the Social Security Administration. That was a felony. 42 U.S.C. § 408(a)(7)(B). She had used the number to obtain a job. There is no indication that had she not done this, an American citizen would have gotten the job in her stead rather than one of the 10 or 11 million other illegal aliens who live in the United States and like Arias need to work in order to support themselves. The statute does not require proof of intent to cause harm—an absence that one would think would negate an inference of moral turpitude. Nor is it required that the violation be material; nor was there proof in this case that the violation wrongfully deprived anyone of social security benefits or increased the expenses of government. Unsurprisingly Arias was punished very lightly: she was merely placed on probation for a year and assessed $100, which is the mandatory assessment for felony convictions. See 18 U.S.C. § 3013. So: no incarceration, no fine, just a year's probation and an assessment equivalent to the amount of money she earns in 9.1 hours of work (for her wage is $10.97 per hour).

Conceivably her very light sentence reflects in part the fact that she has two young children, has worked without incident since coming to the United States in 2000, and has paid federal income tax. Or maybe the judge thought her

crime trivial, as do I. (Has the Justice Department nothing better to do with its limited resources than prosecute a mouse? Has prosecutorial discretion flown out the window?) She did not steal or invent the social security number; it was given her by the persons who smuggled her into the United States.

After completing her probation she was allowed to resume her employment with the same company she'd worked for until her arrest, and she obtained a glowing letter of support from the general manager. She does manual work for the company, described by the general manager as "sealer sanding doors, wear thru and working with specialty paints." It is the kind of work that illegal immigrants typically do, because it is not pleasant work and it is not well paid.

To prosecute and deport such a harmless person (to Ecuador, her country of origin)—indeed a productive resident of the United States—would be a waste of taxpayers' money, but to deport her on the ground that her crime was one of moral turpitude would be downright ridiculous. The crime she committed does not appear in the State Department's list of crimes of moral turpitude, and it is less serious than many of the crimes in the second list (those that are not crimes of moral turpitude). It is somewhat similar to crime category 13 in the second list—"immigration violations"—but she was not convicted of violating immigration law, but instead of violating a section of 42 U.S. Code, Chapter 7, Subchapter II. The title of the subchapter is "Federal Old-Age, Survivors, and Disability Insurance Benefits." Her crime could also be placed in category 10 on the second list—"false statements (not amounting to perjury or involving fraud)." The State

Department explicitly tells us that false statements do *not* constitute crimes of moral turpitude.

And yet the government argues that the petitioner's conduct was "deceptive" and therefore a crime of "moral turpitude." But glance again at the second list, the list of crimes that are not crimes of moral turpitude. In addition to crime 10—"false statements"—which by definition involves deception, crimes 1, 3, 4, 15, 18, and 19 on that list may also involve deception. When a panel of this court said in *Marin-Rodriguez v. Holder*, 710 F.3d 734, 738 (7th Cir. 2013), a case factually almost identical to this one, that "crimes entailing an intent to deceive or defraud are unquestionably morally turpitudinous," it was deviating from the *Manual* without explanation.

Interestingly, the immigration judge in our case said that "unfortunately" the Seventh Circuit had ruled in *Marin-Rodriguez* that the type of conviction involved in Arias's case was "inherently turpitudinous." The judge's instincts were sound, but she felt bound by our decision. The Board of Immigration Appeals affirmed her ruling primarily on the authority of *Marin-Rodriguez*. But *Marin-Rodriguez* was wrong and should be overruled. The court had no basis for rejecting what for a change was proper guidance from the State Department's Manual.

The idea that fraudulent intent colors any crime "turpitudinous" had received its authoritative modern statement in *Jordan v. De George*, 341 U.S. 223 (1951), like this a deportation case, where we read for example that "fraud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude."

*Id*. at 229. But notice that the word used by the Court to describe a crime of moral turpitude was "fraud," not "deception," and *De George* was a fraud case in the core sense of "fraud": it was a conspiracy to defraud the federal government of tax revenues.

Yet, though it was a much stronger case for deportation than this case, the majority opinion evoked a remarkable dissent by Justice Jackson, *id*. at 232–245, joined by Justices Black and Frankfurter. The dissent picked apart the concept of "moral turpitude." It exposed its emptiness ("Congress did not see fit to state what meaning it attributes to the phrase 'crime involving moral turpitude.' It is not one which has settled significance from being words of art in the profession. If we go to the dictionaries, the last resort of the baffled judge, we learn little except that the expression is redundant, for turpitude alone means moral wickedness or depravity and moral turpitude seems to mean little more than morally immoral. The Government confesses that it is 'a term that is not clearly defined,' and says: 'the various definitions of moral turpitude provide no exact test by which we can classify the specific offenses here involved.' Except for the Court's opinion, there appears to be universal recognition that we have here an undefined and undefinable standard"). *Id*. at 234–235. And the dissent argued convincingly that deportation was an extreme sanction to impose on De George, the alien, without a more definite standard guiding its imposition. See *id*. at 240–242.

Alas, a great dissent by a great Justice has been forgotten. The concept of moral turpitude, in all its vagueness, rife with contradiction, a fossil, an embarrassment to a modern legal system, continues to do its dirty work. Even so, and de-

spite the precedent of *Marin-Rodriguez*, there is a route to jus-
tice in this case. It is to recognize that this is *not* a fraud case.
Although convicted of a crime against the government, the
petitioner, unlike her predecessor De George, was not seek-
ing any money from the government. So far as appears her
crime harmed no one, least of all the government though it is
the "victim" of her crime, and so even the muddled over-
broad *Foreign Affairs Manual* provides no basis for classifying
her crime as one of moral turpitude. This case is identical to
*Beltran-Tirado v. INS, supra*, where the Ninth Circuit held that
using a false social security number on an employment veri-
fication form in order to obtain employment was *not* a crime
of moral turpitude. Consider, too, *In re Delagadillo*, 15 I. & N.
Dec. 395 (BIA 1975), where the Board of Immigration Ap-
peals held that an applicant for admission to the United
States who had "fabricated a property transfer in an unsuc-
cessful attempt to reduce his wife's potential settlement in a
divorce action" had *not* committed a crime "so base or vile as
to be deemed morally turpitudinous." The Ninth Circuit and
the Board of Immigration Appeals recognized in these cases,
as the State Department does in its manual, that deception
alone is not enough to make a crime one of moral turpitude.
Our prior cases that have purported to extend *De George*'s
fraud rule to cover *any* deception have generally done so in
dicta, because the cases involved more than simple decep-
tion. See *Abdelqadar v. Gonzales*, 413 F.3d 668, 671 (7th Cir.
2005); *Padilla v. Gonzales*, 397 F.3d 1016, 1017–18, 1020–21 (7th
Cir. 2005).

In *Lagunas-Salgado v. Holder*, 584 F.3d 707 (7th Cir. 2009),
an alien had been convicted of making "false Social Security
and alien registration cards so that others could find em-
ployment." *Id.* at 708. The Board of Immigration Appeals

deemed his crime one of moral turpitude and a panel of this court affirmed. It was a more serious crime than our petitioner's, because Lagunas-Salgado had sold false papers to about 50 people, some for as much as $100; and he was sentenced to five months in prison and two years of probation, a much heavier sentence than Arias received. The panel opinion in *Lagunas-Salgado* remarks with apparent approval the BIA's conclusion "that petty larceny and issuing a worthless check involve moral turpitude" but that "crimes such as importing, selling, or possessing drugs do not involve moral turpitude because evil intent is not an element of the offense." *Id*. at 710. That is an absurd distinction, given that the congressional mandate is to identify crimes that are morally reprehensible and thus a proper ground for deportation.

Yet the approach I'm suggesting derives support from *Lagunas-Salgado*. The panel was emphatic that it was a fraud case, 584 F.3d at 711–12, and I read *Jordan v. De George* to hold that crimes of fraud are *ipso facto* crimes of moral turpitude. Lagunas-Salgado gave away some of his false documents but sold others, and was "deceiving the government" because "he knew the persons receiving the false documents would use them in an attempt to obtain work that they could not otherwise lawfully obtain." *Id*. at 712. The petitioner in our case did not forge documents, let alone for gift or sale to other persons. The impact of her conduct on her "victim," the U.S. Government, was negligible, as reflected in the nominal sentence that she received relative to the heavier (though still light) sentence imposed on Lagunas-Salgado.

*Marin-Rodriguez* is closer to our case, but the alien in that case had been convicted under a different statute, 18 U.S.C. § 1546, which is entitled "Fraud and misuse of visas, per-

mits, and other documents," authorizes sentences of up to 10 years in prison (even longer if the offense was committed in connection with drug trafficking or terrorism), and thus punishes more heavily conduct more reprobated than the conduct in which the petitioner in this case engaged. The court in *Marin-Rodriguez* was mistaken, however, as I've said, in assuming that all deceptive acts, no matter how harmless, are crimes of moral turpitude. See 710 F.3d at 738. It based that proposition on *De George*, *Abdelqadar*, and *Padilla*, despite the fact that none of those cases involved harmless deception.

If anything is clear it's that "crime of moral turpitude" shouldn't be defined by invoking broad categorical rules that sweep in harmless conduct. Yet that's what the Board of Immigration Appeals did in this case, in upholding the immigration judge's conclusion that the petitioner had committed a crime of moral turpitude; it said that a violation of 42 U.S.C § 408(a)(7)(B) is "categorically a crime involving moral turpitude."